UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANITA WASHINGTON,

                                     Plaintiff,

v.                                                            5:04-CV-0997
                                                              (GTS/GJD)
COUNTY OF ONONDAGA; and ONONDAGA
COUNTY CORRECTIONAL FACILITY,

                                     Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

BROWN & HUTCHINSON                      MICHAEL COBBS, ESQ.
  Counsel for Plaintiff
925 Crossroads Building
Two State Street
Rochester, NY 14614

HON. GORDON J. CUFFY                      CAROL L. RHINEHART, ESQ.
County Attorney, Onondaga County      Deputy County Attorney
  Counsel for Defendant
421 Montgomery Street
10th Floor Civic Center
Syracuse, NY 13202

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court in this civil rights action brought by Anita Washington

("Plaintiff") is a motion for summary judgment filed by the County of Onondaga and the

Onondaga County Correctional Facility in Jamesville, New York ("Defendants").  For the

reasons stated below, Defendants' motion is granted, and Plaintiff's Complaint is dismissed.

## I.     RELEVANT PROCEDURAL BACKGROUND

On August 20, 2004, Plaintiff brought this civil rights action against Defendants alleging violations of the following six statutes or laws: (1) the Civil Rights Statutes § 1981, § 1983; (2) Title VII of the Civil Rights Act of 1964; (3) 42 U.S.C. § 2000e *et seq.*; (4) the Civil Rights Act of 1991; (5) New York Executive Law § 296(1)(a); and (6) New York common law.  (Dkt. No. 1.)  Generally, in her Complaint, Plaintiff asserts fifteen causes of action alleging that Defendants (1) permitted and encouraged a racially hostile work environment, (2) punished her and other African American employees more harshly than Caucasian employees, and (3) retaliated against her for complaining about the hostile work environment.  (*Id.*)  Plaintiff requests equitable relief, compensatory damages, costs and attorney's fees.  (*Id.*)

On February 6, 2007, Defendants filed a motion for summary judgment.  (Dkt. No. 40.) Included among their motion papers was a Rule 7.1 Statement of Material Facts that sets forth, in 121 numbered paragraphs, each material fact about which Defendants contend there exists no genuine dispute, as required by Local Rule 7.1(a)(3).  (Dkt. No. 40, Part 4, ¶¶ 4-124.)  Also included among their motion papers was a memorandum of law asserting the following ten arguments: (1) as a threshold matter, all of Plaintiff's claims are barred by the applicable statute of limitations, and Plaintiff cannot benefit from the exception to the statute of limitations for continuing violations; (2) in any event, Plaintiff has failed to allege facts plausibly suggesting that Defendants retaliated against her for engaging in protected speech under the First Amendment; (3) even if Plaintiff stated a retaliation claim, she failed to exhaust her administrative remedies regarding that claim; (4) even if she exhausted her administrative remedies regarding her retaliation claim, she has failed to adduce admissible record evidence in support of that claim; (5) Plaintiff has failed to adduce admissible record evidence in support of

her hostile-work-environment claim; (6) Plaintiff has failed to adduce admissible record

evidence in support of her disparate-treatment claim; (7) Plaintiff has failed to adduce admissible

record evidence in support of either her race-discrimination or gender-discrimination claims; (8)

Plaintiff has failed to adduce admissible record evidence in support of her claim of municipal

liability sufficient to establish a claim under either 42 U.S.C. § 1981 or 42 U.S.C. § 1983; (9)

Plaintiff cannot recover damages for intentional infliction of emotional distress, under the

circumstances; and (10) Plaintiff is not entitled to punitive damages under the circumstances.

(Dkt. No. 40, Part 5, at 3-25.)

On April 3, 2007, Plaintiff, through counsel, filed a response to Defendants' motion for

summary judgment.  (Dkt. No. 54, 55.)  In that response, Plaintiff filed a statement of material

facts that did not "mirror the movant's Statement of Facts by admitting and/or denying each of

the movant's assertions in matching numbered paragraphs . . . [supporting each denial with] a

specific citation to the record where the factual issue arises," as required by Local Rule 7.1(a)(3).

(*Compare* Dkt. No. 40, Part 4 [Defs.' Rule 7.1 Stmt.] *with* Dkt. No. 55, Part 1 [Plf.'s Rule 7.1

Response].)  Furthermore, on April 5, 2007, Plaintiff filed an Amended Rule 7.1 Response,

which (among other things) corrected Plaintiff's use of the first-person voice in her original Rule

7.1 Response, but which did not correct the error identified above.  (Dkt. No. 57, Part 1.)

On April 10, 2007, Defendants filed a letter brief, requesting that the Court disregard

Plaintiff's response as untimely.  (Dkt. No. 59.)  On October 1, 2008, this case was reassigned to

the undersigned.  (Dkt. No. 61.)  On October 14, 2008, the Court issued a Text Order reserving

on the issue of whether or not to disregard as untimely Plaintiff's response, and granting

Defendants an extension of the deadline by which they could file a reply.  *See* Text Order of

10/14/2008.  On October 15, 2008, Defendants filed their reply.  (Dkt. No. 62.)

## II.   STATEMENT OF FACTS

As stated above in Part I of this Decision and Order, Defendants' Rule 7.1 Statement of Material Facts sets forth, in 121 numbered paragraphs, each material fact about which Defendants contend there exists no genuine dispute, as required by Local Rule 7.1(a)(3).  (Defs.' Rule 7.1 Stmt. at ¶¶ 4-124.)  However, in her Rule 7.1 Response, Plaintiff failed to admit and/or deny each of Defendants' assertions in matching numbered paragraphs supported with a specific citation to the record where the factual issue arises, as required by Local Rule 7.1(a)(3).  (*Compare* Defs.' Rule 7.1 Stmt. *with* Plf.'s Rule 7.1 Response.)  As a result, each of Defendants' factual assertions, contained in Paragraphs 4 through 124 of their Statement of Materials Facts, are deemed "admitted" by Plaintiff, for purposes of Defendants' motion.  N.D.N.Y. L.R. 7.1(a)(3).

While the Court declines to perform an independent review of the record to find proof of a factual dispute (*see*, *infra*, note 17 of this Decision and Order), the Court notes that (in addition to carefully reading all of Defendants' papers) it has generally reviewed Plaintiff's Rule 7.1 Response and evidence in order to understand the parties' legal arguments and determine if Defendants have met their modest threshold burden on their motion.  As a result, the following statement of facts–which consists of those factual assertions that are undisputed on the current record–contains citations to both Defendants' Rule 7.1 Statement and (where appropriate) Plaintiff's Rule 7.1 Response.

A.      **Overview of the Onondaga County DOC**

Plaintiff is an African American female who works at the Onondaga County Correctional

Facility, and is employed by the County of Onondaga.  (Dkt. No. 57, Part 1, at ¶ 1 ["Plf.'s Rule

7.1 Response"]; Dkt. No. 40, Part 4, at ¶¶ 2-3 ["Defs.' Rule 7.1 Stmt."].)  The Onondaga County

Department of Corrections ("DOC") operates as a paramilitary organization.  (Defs.' Rule 7.1

Stmt at ¶ 4.)  Since 1999, Timothy Cowin has served as the Commissioner of Corrections, its

highest-ranking official.  (Dkt. No. 40, Part 3, at 1, ¶ 4 ["Cowin Aff."].)  Cowin has two

Assistant Commissioners, Patricia Mosley, who currently handles administrative operations, and

Randy Blume, who handles security operations.  (*Id*. at ¶ 3.)  The positions of captain, lieutenant,

sergeant, senior correction officer, correction officer, and correction officer trainee are all civil

service positions governed by New York State Civil Service Law.  (*Id*. at ¶ 6; Plf.'s Rule 7.1

Response at ¶ 30.)

The DOC has a policy and procedure manual, which its staff is required to follow.

(Defs.' Rule 7.1 Stmt. at ¶ 7.)  The policy manual contains a number of policies, procedures/rules

and regulations including, but not limited to, a selection, retention and promotion of personnel

policy, an attendance policy, and a number of policy and procedures directly related to the

operation of the facility.  (Cowin Aff. at ¶¶ 5-6.)  Among the DOC policies related to the

operation of the facility is the policy prohibiting sexual, racial and national origin harassment.

(Dkt. 40, Part 8 [Ex. C to Defs.' Rule 7.1 Stmt.].)  This policy defines harassment and invites

aggrieved employees to utilize the discrimination Grievance Procedure.  (*Id*.)  In addition, the

County has in place procedures for processing employee harassment and discrimination

complaints.  (Dkt. 40, Part 10 [Ex. E to Defs.' Rule 7.1 Stmt.].)  These procedures are made

available to all employees of the County in the form of a directive manual.  (Dkt. No. 40, Part 11 [Ex. F to Defs.' Rule 7.1 Stmt.].)  The directive manual was updated in April of 2001 to incorporate revised County policies regarding harassment.  (*Id*.)  On April 18, 2001, Plaintiff acknowledged that she received and read the manual.  (Dkt. 40, Part 12 [Ex. G to Defs.' Rule 7.1 Stmt.].)

The DOC also has a Policy and Procedures Directive entitled "Socialization."  (Cowin Aff. at ¶ 20.)  This policy prohibits staff from associating with, or having any dealings with criminals or persons who are engaged in unlawful activity.  (*Id*.)  The policy also prohibits engaging in any conversation, communication, dealing, transaction, association or relationship with any inmate, former inmate, probationer or former probationer, parolee or former parolee, or any visitor, friend or relative of same in any manner or from which is not necessary or proper for the discharge of the employee's duties.  (*Id*.)  The purpose of the socialization policy is twofold: (1) to prevent the evolvement of situations that encourage manipulation of or dependency upon staff, and (2) to prevent related security problems.  (*Id*. at ¶ 21.)  Adherence to the policy is crucial to the safety and well-being of staff members and inmates.  (*Id.*)

The DOC also has a Policy and Procedure Directive entitled "Selection, Retention and Promotion of Personnel" that sets forth the procedures to be followed for promotions.  (*Id*. at ¶ 35.)  Positions can be filled only with approval from the County's Department of Management and Budget.  (*Id*.)  Therefore, the Onondaga County Department of Management and Budget has the ultimate authority to determine whether or not the Commissioner of Correction can hire and/or promote.  (*Id*. at ¶ 36.)

Once the Commissioner is granted approval to hire and/or promote, the Commissioner

reviews the civil service list that ranks all eligible individuals for the given position based on their performance on the Civil Service Examination.  (*Id*.)  The eligible candidates are then canvassed to determine whether or not they are interested in the position.  (*Id*.)  The Commissioner must select one of the top three highest scoring candidates interested in the position.  (*Id*.)  In deciding among the three candidates, the Commissioner considers a number of factors, including previous training, experience, and overall employment history, which encompasses attendance, performance evaluations, achievements, disciplines and seniority.  (*Id*. at ¶ 37.)

**B.  Plaintiff's Employment with the DOC**

Plaintiff passed the civil service exam, and began as a correction officer trainee with the DOC in May of 1982.  (Defs.' Rule 7.1 Stmt. at ¶ 21.)  She was appointed senior correction officer in November of 1983, achieving permanent status in May of 1984.  (*Id*. at ¶ 25.)  She became a sergeant after completing a probationary term in June of 1987.  (*Id*. at ¶ 26.)  In 1995, this position was eliminated in a county-wide workforce reduction, and she was downgraded to senior correction officer.  (*Id*. at ¶ 27.)  She was re-instated as a sergeant in 1997.  (*Id*. at ¶ 28; Plf.'s Rule 7.1 Response at ¶ 33.)

In both her tours as sergeant, Plaintiff received a number of training sessions as a supervisor, including cultural diversity training, sexual harassment training, and general harassment training.  (Defs.' Rule 7.1 Stmt. at ¶ 29.)  Plaintiff also received a number of awards and commendations, helped develop a response team, and was recognized for her participation as a member of the Black History Month Committee.  (*Id*. at ¶¶ 30-32.)

Plaintiff's attendance record from 1999 through 2003 was marked by a number of

absences.  (*Id*. at ¶ 33; Plf.'s Rule 7.1 Response at ¶¶ 68-82.)  Specifically, she missed work

during the following time periods: (1) from August or September of 1999 until August 5, 2000

(*compare* Defs.' Rule 7.1 Stmt. ¶ 34 *with* Plf.'s Rule 7.1 Response at ¶¶ 68-72);[1] (2) for ten days

in February of 2001 (*compare* Defs.' Rule 7.1 Stmt. at ¶ 35 *with* Plf.'s Rule 7.1 Response at ¶¶

73-74);[2] and (3) from September of 2002 through May of 2003 (Plf.'s Rule 7.1 Response at ¶¶

75-82).[3]

### C.    Plaintiff's Disciplinary Record

Disciplinary action is determined by the Commissioner of Correction, in consultation

with the Personnel Advisory Committee ("PAC").  (Defs.' Rule 7.1 Stmt. at ¶ 38; Plf.'s Rule 7.1

Response at ¶¶ 41-43.)  All disciplinary measures are meted out according to the surrounding

circumstances, including violation of policies and procedures as well as the employee's history.

(Defs.' Rule 7.1 Stmt. at ¶ 38.)  Throughout her employment, she has received a number of

disciplinary citations.  (*Id*. at ¶ 37; Plf.'s Rule 7.1 Response at ¶¶ 83-114.)

### 1.    Written Reprimands for Violating DOC's Policies

Plaintiff's first discipline was instituted in February of 1991 for failure to timely complete

an investigation of an inmate grievance.  (Defs.' Rule 7.1 Stmt. at ¶ 39; Plf.'s Rule 7.1 Response

---

[1]     Plaintiff's Rule 7.1 Response asserts that she was out of work in 1999 after suffering injuries from an automobile accident.  (Plf.'s Rule 7.1 Response at ¶¶ 70-71.)

[2]     Plaintiff's Rule 7.1 Response asserts that she was out of work due to assisting her mother with an illness.  (Plf.'s Rule 7.1 Response at ¶ 73.)

[3]     Plaintiff's Rule 7.1 Response asserts that she was out of work because she suffered a serious back injury after attempting to break up a fight between two inmates.  (Plf.'s Rule 7.1 Response at ¶ 75.)  According to Plaintiff, although inmate dinner coverage is handled by at least two officers, during the incident where Plaintiff was injured, she was working without coverage after being ordered to work by Lieutenant Conboy.  (Plf.'s Rule 7.1 Response at ¶¶ 76-82.)

at ¶ 84.)  She received a written reprimand for this offense.  (Defs.' Rule 7.1 Stmt. at ¶ 39.)[4]  In November of 2001, she received a second written reprimand for failing to follow the direct order of her commanding officer to instruct her subordinate officer that she was in violation of the DOC's "Employee Appearance and Dress" directive because she was wearing unauthorized beads in her hair, and for loudly calling her commanding officer a "racist" in front of his subordinate staff.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 40-41 *with* Plf.'s Rule 7.1 Stmt. at ¶¶ 89-99.)[5]  She filed a grievance with respect to this matter, which was denied.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 41 *with* Plf.'s Rule 7.1 Response at ¶¶ 99-103.)

## 2.    Suspension for Violating DOC's Socialization Policy

In September of 2001, the DOC became aware of Plaintiff's relationship with a former inmate, after being notified of that relationship by the Syracuse Police Department ("SPD"), which had learned about the relationship during an investigation of a hit-and-run accident involving her vehicle.  (Defs.' Rule 7.1 Stmt. at ¶ 44; Plf.'s Rule 7.1 Response at ¶ 120.)   The DOC did not take disciplinary action against her between September 2001 and March 2002, because during that time period, rather than conduct its own investigation of the socialization offense, the DOC was relying on information generated during a criminal investigation of a related matter (specifically, a hit-and-run accident involving Plaintiff's vehicle), conducted by the SPD and the Onondaga County District Attorney's Office.  (Defs.' Rule 7.1 Stmt. at ¶ 44

---

[4]    Plaintiff's Rule 7.1 Response asserts that, according to the Employee Handbook, a written reprimand is only authorized after a second offense.  (Plf.'s Rule 7.1 Response at ¶ 87.)

[5]    Plaintiff's Rule 7.1 Response asserts that she was chosen to reprimand this woman solely because they were both African-American females, and further asserts that other white officers ignored the situation for three days, preferring to have Plaintiff address the issue.  (Plf.'s Rule 7.1 Response at ¶¶ 96-102.)

[citing record evidence establishing referenced facts].)[6]  Finally, while the DOC was

interviewing her regarding the socialization issue on or just days before March 12, 2002, she

admitted to having a relationship with a former inmate.[7]  (Defs.' Rule 7.1 Stmt. at ¶ 44; Plf.'s

Rule 7.1 Response at ¶¶ 119, 127; Dkt. No. 49 at 40-42, 79-82 [Blume Dep. Tr.]; Dkt. No. 40,

Part 42 [Ex. KK to Defs.' Rule 7.1 Stmt.].)

As a result, on March 12, 2002, Plaintiff was found to have violated the DOC's

socialization policy, which prohibits social relationships between staff and inmates.  (Plf.'s Rule

7.1 Response at ¶ 119; Defs.' Rule 7.1 Stmt. at ¶ 42.)  She was suspended for thirty (30) days

without pay and required to abide by the socialization policy.  (Defs.' Rule 7.1 Stmt. at ¶ 45.)

---

[6]    (*See also* Dkt. No. 49 at 37-41, 79-81 [Blume Dep. Tr., in which he testified, *inter alia*, that "the reports we had were based on the police reports . . . . The actual investigation was pursued by the DA's Office . . . we were waiting and trying to find out information through their investigation. . . .  We were waiting also on whether Sergeant Washington was going to be charged with obstructing [governmental administration].  That was a matter that sort of conflicted here with the other matter of the socialization.  It could have been a matter of obstructing too. . . .  We didn't question [Sergeant Washington about] the socialization [charge] until . . . [w]e got the information we received from the police report . . . . We took action on the socialization that was inferred [sic] in the reports and then a subsequent ongoing investigation of the accident and Ms. Washington's relationship to [the suspect].  This was an ongoing investigation and we – they exhausted the matter with the criminal investigation. . . .  We were relying on the information from the District Attorney's Office and the reports . . . . We didn't [do any investigations] ourselves, so far as I know. . . .  The DA's Office was investigating the accident and that relationship as far as [the suspect] also."]; Dkt. No. 40, Part 42 [Ex. KK to Defs.' Rule 7.1 Stmt., attaching Notice of Charges dated 3/12/02, which states, *inter alia*, that "[After September 23, 2001], we learned that [the SPD] interviewed a male suspect  [in the hit-and-run accident] who you identified as your boyfriend.  An on-going investigation by the County District Attorney's Office into the accident has produced information that your boyfriend is a former inmate who lived at your address prior to September 22, 2001, and continues to reside there today"].)

[7]    Plaintiff's  Rule 7.1 Response asserts that the relationship developed after the inmate was released, and at no point during the incarceration was the relationship romantic in nature.  (Plf.'s Rule 7.1 Response at ¶¶ 125-27.)

She challenged the suspension, which was reduced to twenty (20) days without pay.  (*Id*. at ¶ 46; Plf.'s Rule 7.1 Response at ¶ 129.)

Between 1999 and 2004, other DOC employees also violated the socialization policy. (Defs.' Rule 7.1 Stmt. at ¶¶ 47-53.)  Specifically, in December of 1999, a white male corrections officer was suspended without pay for developing social relationships with female inmates. (Defs.' Rule 7.1 Stmt. at ¶ 47.)  This officer was also terminated and charged with official misconduct, class A misdemeanors and two counts of harassment violations.  (*Id*.)

Four months later, a different white male officer was charged with initiating personal contacts and developing social relationships with female inmates incarcerated at the facility.  (*Id*. at ¶ 48.)  The officer was sanctioned six (6) working days leave without pay and four (4) days loss of accrual leave.  (*Id*.)  One year later, the same officer violated the socialization policy again when he was charged with associating and maintaining an ongoing relationship with a former inmate on probation.  (*Id*. at ¶ 49.)  As a sanction for the second violation, after negotiations with the union, the officer received twenty (20) days disciplinary leave without pay (brought down from the sixty days the DOC sought).  (*Id*; Plf.'s Rule 7.1 Response at ¶ 185.)

In January of 2002, the Recreation Supervisor of the DOC, a white officer, was suspended and charged with violating the socialization policy after an investigation revealed that this officer was harassing a female inmate, and was trying to develop relationships with other female inmates.  (Defs.' Rule 7.1 Stmt. at ¶ 50; Plf.'s Rule 7.1 Response at ¶¶ 186-87.)  This individual was also arrested and charged with two counts of promoting prison contraband and two counts of official misconduct, all class A misdemeanors.  (Defs.' Rule 7.1 Stmt. at ¶ 50; Plf.'s Rule 7.1 Response at ¶¶ 187-88.)  The DOC ultimately terminated this officer.  (Defs.' Rule 7.1 Stmt. at ¶ 50.)

In November of 2002, an African-American sergeant was suspended on two sets of charges, which alleged (1) that he unlocked an inmate to allow her to iron for him, and (2) that he perpetrated illegal activities for inmates incarcerated at the facility.  (*Id*. at ¶ 51.)  This sergeant was terminated and arrested for his conduct.  (*Id*.)

In April of 2004, a six-year veteran correction officer was suspended for developing a personal relationship with a female inmate while at the facility; a relationship that he continued when she was discharged.  (*Id*. at ¶ 52.)  The correction officer was terminated for his conduct, but an arbiter reduced the termination to a ninety (90) day suspension.  (*Id*. at ¶¶ 52-53.)

### 3.    Plaintiff's Second Suspension for Violating DOC's Socialization Policy

Following Plaintiff's twenty-day suspension without pay, she returned to work under the condition that she comply with the socialization policy.  (Defs.' Rule 7.1 Stmt. at ¶ 54.)  Immediately upon her return, she was called into a meeting, where her union representative and Security Captain asked if she was complying with the socialization policy.[8]  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 54 *with* Plf.'s Rule 7.1 Response at ¶¶ 133-36.)

Before answering, Plaintiff indicated that she needed to speak to a lawyer.[9]  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 55 *with* Plf.'s Rule 7.1 Response at ¶¶ 137-38.)  The following day, she was again asked by Captain Tripoli if she was in compliance with the socialization policy.  (Defs.' Rule 7.1 Stmt. at ¶ 56; Plf.'s Rule 7.1 Response at ¶ 139.)  She said she had not been able

---

[8]    Plaintiff's Rule 7.1 Response asserts, without offering any supporting admissible record evidence, that "no one in the over 150 year history of the Department of Correction had ever been called into the office and interrogated after returning to work from a suspension."  (Plf.'s Rule 7.1 Response at ¶ 134.)

[9]    Plaintiff's Rule 7.1 Response asserts that she wanted to have a lawyer present because she had a grievance pending on the socialization issue, and because she was entitled to one according to the union manual.  (Plf.'s Rule 7.1 Response at ¶ 137.)

to reach her attorney, and therefore would not respond.  (Defs.' Rule 7.1 Stmt. at ¶ 56; Plf.'s Rule 7.1 Response at ¶ 140.)  She was given a deadline of four (4) days to respond.  (Defs.' Rule 7.1 Stmt. at ¶ 56; Plf.'s Rule 7.1 Response at ¶ 141.)

Four days later, Plaintiff and her Union representative met with Captain Tripoli and Lieutenant Conboy, and she was again asked by Captain Tripoli if she was in compliance with the policy.  (*Id*. at ¶ 57.)  Instead of responding, she indicated that she had some questions about the policy and wanted a documented explanation as to the meaning of some of the terms.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 57-58 *with* Plf.'s Rule 7.1 Response at ¶¶ 143-44.)  Captain Triploi explained that the DOC directives mean it is not "necessary and proper" to live with an inmate.  (Defs.' Rule 7.1 Stmt. at ¶ 58.)  Plaintiff then requested documentation showing proof that she lived with a former inmate.  (*Id*. at ¶ 59; Plf.'s Rule 7.1 Response at ¶¶ 147-48.)  The meeting ended without her answering Captain Tripoli's question to his satisfaction.  (Defs.' Rule 7.1 Stmt. at ¶¶ 59-60; Plf.'s Rule 7.1 Response at ¶ 150.)

The following day (April 18, 2002), Assistant Commissioners for Security Randy Blume and Patricia Mosley met with Plaintiff.  (Defs.' Rule 7.1 Stmt. at ¶ 60; Plf.'s Rule 7.1 Response at ¶ 160.)  During this meeting, Plaintiff insisted that she had no former inmate living with her.  (Defs.' Rule 7.1 Stmt. at ¶ 60.)  She also submitted a memorandum stating as follows: "There exists the possible circumvention of involvement of individuals as specified in section III of the socialization policy.  This involvement is based on my personal outside curriculum of church association, community outreach, and business affiliation."  (*Id*; Plf.'s Rule 7.1 Response at ¶ 162.)

A week later, Plaintiff was suspended for two days as a disciplinary measure.  (Defs.' Rule 7.1 Stmt. at ¶ 62.)  She was charged with (1) neglect of job duties or responsibilities, (2)

failure to follow job instructions, directions or DOC procedures and policies, and (3) refusal to follow job instructions (as a result of her failure to answer Captain Tripoli's Orders to respond to his question regarding compliance with the socialization policy).  (*Id*. at ¶ 61.)

Four months later, the DOC commenced an investigation to determine whether Plaintiff continued to violate the socialization policy.  (*Id*. at ¶ 63.)  The DOC received information from the former inmate who resided with her, indicating that he continued to live with her until the beginning of July.  (*Id*.)  The inmate provided a written statement, pay stubs and a fishing license, all which indicated that he resided at her residence.  (*Id*.)

In response, Plaintiff provided Assistant Commissioner Patricia Mosley with a memorandum regarding her adherence to the socialization policy, indicating that her April 18, 2002, statement to Randy Blume from was still in effect.[10]  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 64 *with* Plf.'s Rule 7.1 Response at ¶ 167.)  Nonetheless, the DOC again charged Plaintiff with violations of policy and procedure directives, including the socialization policy, and suspended her for forty-five (45) days without pay.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 65-66 *with* Plf.'s Rule 7.1 Response at ¶¶ 169-76.)  She was also demoted two ranks to correction officer.  (Defs.' Rule 7.1 Stmt. at ¶ 66; Plf.'s Rule 7.1 Response at ¶ 169.)  In response, she filed a grievance.  (*Id*. at ¶ 177.)  On July 15, 2004, an arbiter sustained her grievance and reinstated Plaintiff to her position, with restoration of benefits and wages for the period of her suspension.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 67 *with* Plf.'s Rule 7.1 Response at ¶¶ 177-78.)

---

[10]     This statement also indicated that Plaintiff was in compliance with the socialization policy, and not in a relationship or living with any former inmate.  (Plf.'s Rule 7.1 Response at ¶ 167.)

### 4.        Other Disciplinary Measures Against Plaintiff

On December 18, 2003, Plaintiff received an oral warning for failing to read nine DOC directives that she was responsible for enforcing.  (Defs.' Rule 7.1 Stmt. at ¶ 69; Plf.'s Rule 7.1 Response at ¶ 104.)  Her prior explanation (offered two days before December 18, 2003) for not having read the DOC directives at issue was that she had not had sufficient time in which to do so.  (Dkt. No. 41, Part 17 [Ex. QQQ to Defs.' Rule 7.1 Stmt]; Plf.'s Rule 7.1 Response at ¶ 105.)

On February 26, 2004, Plaintiff received another oral warning for (1) failing to conduct an inmate count with the on-coming officer during a shift change, and (2) turning in a housing unit count slip indicating the incorrect number of inmates.  (Defs.' Rule 7.1 Stmt. at ¶ 69; Plf.'s Rule 7.1 Response at ¶ 107.)  She had initially conducted the correct count, but then she changed her count to conform with that of the on-coming officer.  (Dkt. No. 41, Part 18 [Ex. RRR to Defs.' Rule 7.1 Stmt]; Plf.'s Rule 7.1 Response at ¶¶ 110-11.)[11]

On June 24, 2004, Plaintiff received another oral warning for having conducted an incorrect count.  (Defs.' Rule 7.1 Stmt. at ¶ 69; Dkt. No. 41, Part 19 [Ex. SSS to Defs.' Rule 7.1 Stmt]; Plf.'s Rule 7.1 Response at ¶ 112.)

Both parties agree that these types of disciplines are relatively common.  (Defs.' Rule 7.1 Stmt. at ¶ 69; Plf.'s Rule 7.1 Response at ¶ 113.)  In June of 2004, a number of Plaintiff's disciplines were removed from her file.  (Defs.' Rule 7.1 Stmt. at ¶ 70.)

### D.        Plaintiff's Promotion to Lieutenant

Plaintiff took the civil service exam for promotion to lieutenant in 1997.  (Defs.' Rule 7.1

---

[11]        Plaintiff's Rule 7.1 Response asserts that she was disciplined for having the incorrect count, but the on-coming white officer was not.  (Plf.'s Rule 7.1 Response at ¶ 111.)

Stmt. at ¶ 72.)  She scored well on this examination, placing her tied for third on the list of

certified eligibles.  (*Id.*)  However, on or about May 17, 2000, the DOC promoted Sergeant

Volney Burgess, the individual ranked first on the certified eligibles list, to lieutenant.  (*Id.* at ¶¶

73-74.)  Sergeant Burgess was promoted at a time when the DOC was reorganizing, and

Commissioner Cowin felt the head of the Maintenance Division (Sergeant Burgess) should be

elevated to lieutenant.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 75 *with* Plf.'s Rule 7.1 Response at ¶¶

286-95.)  Because Sergeant Burgess ran the maintenance division prior to being promoted to

lieutenant, he had the necessary experience for which Commissioner Cowin was looking.  (Defs.'

Rule 7.1 Stmt. at ¶ 75.)

        In July of 2000, there was another vacancy for a lieutenant position.  (*Id.* at ¶ 76.)  The

list of certified eligibles contained four individuals, ranked one through three.  (*Id.*)  Plaintiff was

tied for third on the list.  (*Id.*)  The DOC promoted Sergeant Robert Burnett, who ranked second

on the list.  (*Id.* at ¶ 77.)  Burnett held the title of lieutenant previously, but due to a county

work-force reduction had been demoted to sergeant.  (*Id.*)

        In September of 2000, another lieutenant position opened up, and Plaintiff was again

ranked in the top three on the list of certified eligibles.  (*Id.* at ¶ 78.)  This time, Sergeant Kevin

McGinn, who was ranked first on the list, was selected.  (*Id.* at ¶ 79.)  According to Defendant,

Plaintiff was neither equally qualified nor more qualified than was McGinn.  (*Id.* at ¶ 80.)

        In 2001, the DOC issued another promotional examination for lieutenant.  (*Id.* at ¶ 81.)

Plaintiff took the exam, and ranked third on the list of certified eligibles.  (*Id.*)  The next year,

two lieutenant positions became available.  (*Id.* at ¶ 82.)  The first position was filled by the

individual who ranked first on the list of certified eligibles.  (*Id.* at ¶ 82.)  The second position

16

was filled by the individual ranked fifth on the list. (*Id.* at ¶ 83.)

Despite being ranked higher than this individual, Plaintiff, along with the individual ranked second on the list, were skipped over due to prior suspensions that they had both received.[12] (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 83 *with* Plf.'s Rule 7.1 Response at ¶¶ 321-30.) In addition, the individuals ranked third and fourth were skipped over because they indicated that they were not interested in the promotion. (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 83 *with* Plf.'s Rule 7.1 Response at ¶ 324.)

In December of 2002, Commissioner Cowin requested a certification of eligibles for promotion to lieutenant. (Defs.' Rule 7.1 Stmt. at ¶ 84.) Although Plaintiff ranked third on the list, she was no longer eligible for promotion because she no longer held the position of sergeant.[13] (*Id.*)

## E.    Plaintiff's Racial Concerns

Beginning in 1993, Plaintiff raised numerous racial concerns with the DOC. (Defs.' Rule 7.1 Stmt. at ¶ 85; Plf.'s Rule 7.1 Response at ¶¶ 208-09.) Her first complaint was entered when she discovered, on or about January 21, 1993, that several posters announcing Black Awareness Month Celebration had been tampered with.[14] (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 85 *with* Plf.'s

---

[12]    Plaintiff's Rule 7.1 Response asserts that the individual who was promoted to lieutenant was also disciplined, at least once to Plaintiff's knowledge, for breaking a pad lock off a locked cabinet to retrieve a musical Christmas card for a female inmate. (Plf.'s Rule 7.1 Response at ¶ 328.)

[13]    As stated earlier, Plaintiff was demoted two ranks after receiving her second suspension, and was not reinstated as a sergeant until July 2004.

[14]    Plaintiff's Rule 7.1 Response asserts that "every year white officers would try to sabotage the celebration by removing sign up sheets so that the inmates would not be able to sign up for the events." (Plf.'s Rule 7.1 Response at ¶ 207.)

Rule 7.1 Response at ¶ 207.)  Specifically, the word "black" had been crossed out of "Black History Month" and replaced with "white."  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 85 *with* Plf.'s Rule 7.1 Response at ¶ 208.)  This incident was raised with the DOC Commissioner at the time (Pat Tappan), who required that DOC employees receive cultural diversity training.[15]  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 87-88 *with* Plf.'s Rule 7.1 Response at ¶ 213.)

Between approximately April 5, 1999, and April 9, 1999, racial concerns were revisited when Senior Correction Officer Maxine Adams complained that a racial joke was told in the staff dining room.  (Defs.' Rule 7.1 Stmt. at ¶ 89.)  The "joke," allegedly told by an officer, was that the acronym "N.E.O.N." stood for "niggers excited over nothing."  (Defs.' Rule 7.1 Stmt. at ¶ 89; Plf.'s Rule 7.1 Response at ¶ 218.)  During a subsequent DOC investigation into the matter, a number of staff members came forward to indicate that they heard that the "joke" had been told by Senior Correction Officer Dwight Benjamin.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶ 90 *with* Plf.'s Rule 7.1 Response at ¶ 217.)  However, DOC Assistant Commissioner Thomas Sheedy did not take formal action for the stated reason that his investigation had not yielded first-hand information identifying the officer who told the "joke," only hearsay.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 90-91 *with* Plf.'s Rule 7.1 Response at ¶¶ 218-19.)[16]

---

[15]     Plaintiff acknowledges that all DOC supervisors subsequently received the training.  Furthermore, while she testified in her deposition that, at some point, she heard some unidentified correction officers say they had not (yet) received the training, record evidence exists indicating that, ultimately, *all* correction officers did in fact receive the training. (*Compare* Dkt. No. 46 at 214-15 [Washington Dep. Tr.] *with* Dkt. No. 40, Part 13 [Ex. H to Defs.' Rule 7.1 Stmt.].)

[16]     This stated reason is consistent with the written communications generated during the investigation.  (Dkt. No. 41, Parts 37-39 [Exs. KKKK, LLLL, and MMMM to Defs.' Rule 7.1 Stmt.].)

At some point in late 2000, Plaintiff confronted a white female senior corrections officer, Sarah Brush, who had circulated what Plaintiff perceived as a derogatory flyer, depicting what Plaintiff described as "two black figures playing basketball." (Defs.' Rule 7.1 Stmt. at ¶¶ 93-97; Plf.'s Rule 7.1 Response at ¶ 232; Dkt. No. 41, Part 40 [Ex. NNNN to Defs.' Rule 7.1 Stmt., attaching flyer].) Senior Correction Officer Brush had generated and circulated the flyer for the purpose of exchanging a basketball for some other supplies. (Defs.' Rule 7.1 Stmt. at ¶ 94; Plf.'s Rule 7.1 Response at ¶ 232; Dkt. No. 41, Part 40 [Ex. NNNN to Defs.' Rule 7.1 Stmt., attaching flyer].) After Senior Corrections Officer Brush told Plaintiff she did not see anything wrong with the flyer, Plaintiff showed the flyer to her Watch Commander, Lieutenant Kevin McGinn, complaining that it was racially offensive. (Defs.' Rule 7.1 Stmt. at ¶¶ 97-98; Plf.'s Rule 7.1 Response at ¶ 233.) Lieutenant McGinn replied that he did not feel that it was Senior Correction Officer Brush's intent to circulate something racial, and that perhaps Plaintiff was reading more into the illustration on the flyer than was actually there. (Defs.' Rule 7.1 Stmt. at ¶¶ 98-99; Plf.'s Rule 7.1 Response at ¶ 234.) Plaintiff did not pursue the matter any further up the chain of command. (Defs.' Rule 7.1 Stmt. at ¶ 100; Plf.'s Rule 7.1 Response at ¶¶ 234-35.)

On or about December 13, 2001, Sergeant Benjamin told Plaintiff to "kiss my ass." (Defs.' Rule 7.1 Stmt. at ¶ 101; Plf.'s Rule 7.1 Response at ¶ 223.) In response, Plaintiff filed a formal complaint of racial and sexual harassment. (Defs.' Rule 7.1 Stmt. at ¶ 101; Plf.'s Rule 7.1 Response at ¶ 224.) After investigating the matter, the DOC learned that there were no other witnesses to the incident, and that Benjamin claimed that Plaintiff had insulted him, he intended the remark as a joke, and he had already subsequently apologized to her. (Defs.' Rule 7.1 Stmt. at ¶¶ 101-03; Plf.'s Rule 7.1 Response at ¶ 226; Dkt. No. 41, Part 44 [Ex. RRRR to Defs.' Rule

7.1 Stmt.].)  As a result, the DOC decided to handle the matter informally.  (Defs.' Rule 7.1 Stmt. at ¶ 102; Plf.'s Rule 7.1 Response at ¶ 226.)  During the mediation that ensued, Benjamin personally apologized to Plaintiff a second time and stated it would never happen again.  (Defs.' Rule 7.1 Stmt. at ¶ 104; Dkt. No. 41, Part 43-44 [Exs. QQQQ, RRRR, and SSSS to Defs.' Rule 7.1 Stmt.]; Dkt. No. 44 at 71-74 [Cowin Dep. Tr.].)  The record reflects no subsequent problems between Benjamin and Plaintiff.

### F.     Plaintiff's Human Rights and EEOC Complaints

On November 12, 2002, Plaintiff filed a Complaint with the New York Division of Human Rights and the Federal Equal Employment Opportunity Commission ("EEOC"), charging Defendants with unlawful discriminatory practice.  (Defs.' Rule 7.1 Stmt. at ¶ 115.) Plaintiff's Complaint raised four claims: (1) that she was unfairly disciplined for failing to deal with a situation that she believed was assigned to her because of her race; (2) that a white officer said "kiss my ass" to her but that he was not disciplined because he is a white male and she is a black female; (3) that she was denied a promotion to lieutenant because she is a black female; and (4) that the work place is a racially hostile environment.  (*Id*. at ¶ 116.)  The Division of Human Rights found that there was probable cause to believe that Plaintiff was discriminated against on the basis of race, color and sex, and the matter was set for public hearing.  (*Id*. at ¶ 117.)

On May 7, 2003, while this Human Rights matter was pending, Plaintiff requested administrative leave (paid leave) to determine the whereabouts of three paychecks issued to her. (*Id*. at ¶ 118.)  She was denied leave, but was offered the chance to leave later in a shift on May 7, 2003, once staffing allowed.  (*Id*. at ¶ 119.)  In response, she filed a grievance, which was

denied.  (*Id*. at ¶¶ 119-20.)

Also in May of 2003, Plaintiff filed a grievance because she was denied vacation

according to her seniority.  (*Id*. at ¶ 121.)  She was denied her vacation request because she had

been out of work for eight months, during which time other officers submitted vacation requests,

as per DOC policy, which were approved.  (*Id*.)  She was given the opportunity to submit her

requests upon her return to work, but declined.  (*Id*.)  Instead, she filed a grievance, which was

denied.  (*Id*.)

## III.   RELEVANT LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court

must resolve all ambiguities and draw all reasonable inferences against the moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the moving party]

bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any

genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However,

when the moving party has met this initial responsibility, the nonmoving party must come

forward with "specific facts showing a genuine issue [of material fact] for trial."  Fed. R. Civ. P.

56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury

could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result,

21

"[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]; *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted].  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[17]  For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[18]–even where the nonmoving party was a plaintiff in a civil rights

---

[17]     *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[18]     Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

case.[19]

## IV.   ANALYSIS

### A.   Retaliation

Plaintiff alleges that Defendants retaliated against her for filing grievances and complaining about a racially hostile work environment by denying her "promotional opportunity and unjustly disciplining [her] and taking other adverse employment actions against [her]." (Dkt. No. 1, at 2-3.)  As stated above in Part I of this Decision and Order, Defendants argue (1) that Plaintiff's retaliation claim should be dismissed for failure to comply with the pleading requirements of Fed. R. Civ. P. 8(a), (2) that Plaintiff's retaliation claim should be dismissed for failure to exhaust administrative remedies, and (3) that Plaintiff is unable to establish a prima facie case of retaliation.  For the reasons set forth below, Plaintiff's retaliation claim is dismissed.

"Retaliation claims brought under Section 1981, like those brought under Title VII, are evaluated under the *McDonnell Douglas* burden-shifting analysis."  *Aspilaire v. Wyeth Pharm.,*

---

[19]       *See, e.g., Hassig v. N.Y.S. Dep't of Envtl. Conservation*, 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd*, No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee*, 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd*, No. 04-1921, 2004 U.S. App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd*, No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug*, 2006 WL 2669122, at *2-3; *Fox*, 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron*, 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan*, 289 F. Supp.2d at 295; *Butler v. Weissman*, 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.*, 49 F. Supp.2d 84, 86 & n.1 (N.D.N.Y. 1999) (McAvoy, C.J.); *Costello v. Norton*, 96-CV-1634, 1998 WL 743710, at *1 n.2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.*, 96-CV-1812, 1998 WL 566773, at *1 n.2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

*Inc.*, 07-CV-0952, 2009 WL 988648, at *15 (S.D.N.Y. Mar. 30, 2009) (citations omitted).  "To

establish a prima facie case of retaliation, plaintiff must establish that: (1) she was engaged in a

protected activity; (2) the employer was aware of plaintiff's participation in the protected

activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection

existed between the plaintiff's protected activity and the adverse action taken by the employer."

*Aspilaire*, 2009 WL 988648, at *15 (citation omitted).

"If the plaintiff sets out a prima facie case, then the burden of production shifts to the

defendant to articulate a legitimate, non-retaliatory rationale for its actions."  *Aspilaire*, 2009 WL

988648, at *15 (citation omitted).  "If the defendant proffers a legitimate, non-retaliatory reason,

the burden of production then shifts back to the plaintiff to introduce evidence that the

defendant's reason was a pretext for retaliation."  *Id*. (citation omitted).  "The burden of proof

and persuasion remains at all times with the plaintiff."  *Id*. (citation omitted).

Plaintiff asserts that she was retaliated against for complaining about discrimination in

two instances: (1) when she received a written reprimand for not following an order to address a

fellow employee's violation of an appearance policy; and (2) when she was suspended for

violating the socialization policy.  (Dkt. No. 56, at 29-30.)[20]

### 1.      Written Reprimand

Construed with the utmost of special leniency, Plaintiff's Complaint alleges that, on or

about August 21, 2001, she was–solely because of her race–ordered to discipline a fellow

African-American correction officer, Angela Campbell, for Ms. Campbell's alleged violation of

---

[20]        In her Complaint, Plaintiff characterizes her denial of promotions as giving rise to
a retaliation claim.  (Dkt. No. 1.)  However, because the denials do not involve protected
activity, the denials are more appropriately characterized as giving rise to a claim of
discrimination, and are therefore addressed in Part IV.C. of this Decision and Order.

Defendants' policy regarding improper hair styling, and that, when she complained about the racial motivation behind this order, she received a written reprimand.  (Dkt. No. 1, ¶¶ 10-11, 80-88.)  Based on these factual allegations, Plaintiff has–albeit barely–alleged facts plausibly suggesting that she experienced adverse action because she engaged in protected activity.

In her response papers, Plaintiff has presented factual assertions that flesh out this claim. (Plf.'s Rule 7.1 Response at ¶¶ 89-102.)  Specifically, Plaintiff asserts that, on or about August 21, 2001, she was ordered by her Watch Commander, Lieutenant Kevin McGinn, to inform Correction Officer Campbell that she was not in compliance with DOC's appearance policy because she was wearing unauthorized beads in her hair.  Plaintiff asserts that she did as she was ordered and, the next day, she informed Lieutenant McGinn that she felt that his request was racially motivated in that Plaintiff was being directed to speak to Correction Officer Campbell solely because both women are African American.  Plaintiff asserts that she then received a written reprimand.  Plaintiff asserts that Lieutenant McGinn reprimanded her because he "perceived" her to be calling him a racist.

Under the circumstances, the Court finds that Plaintiff has set out a prima facie case of retaliation.  More specifically, Plaintiff has met her initial burden of alleging facts plausibly suggesting the following: (1) her complaint to Lieutenant McGinn (that she believed that she was ordered to talk to Correction Officer Campbell because both individuals are black females) constituted protected activity, because the complaint was that she was given the order because of her race;[21] (2) her employer was aware of her participation in the protected activity, because she

---

[21]      "The first element of the prima facie case requires a showing that plaintiff engaged in a 'protected activity,' which refers to actions taken to protest or oppose statutorily prohibited discrimination."  *Aspilaire*, 2009 WL 988648, at *15 (citation omitted). "[C]omplaints that the unfair treatment is based on race discrimination in violation of Title VII will render that speech protected from retaliation because race discrimination . . . implicate[s] a

25

made her complaint to a high-ranking supervisor; and (3) she experienced adverse action, specifically, through her receipt of a written reprimand.[22]  Moreover, for the sake of argument, the Court will assume that Plaintiff has met her initial burden of alleging facts plausibly suggesting that there was a casual connection between the adverse action she experienced (i.e., the written reprimand she received) and her protected speech (i.e., her complaining that she was given an order because of her race).

However, the Court finds that, even assuming that Plaintiff has set out a prima facie case of retaliation, Defendants have articulated (and adduced admissible record evidence demonstrating) a legitimate, non-retaliatory rationale for issuing Plaintiff a written reprimand.  In particular, Defendants have provided a copy of the written reprimand, which indicates as follows: (1) before the incident in question, Lieutenant McGinn had asked Plaintiff to talk to Correction Officer Campbell about an employment issue merely because Campbell was one of her subordinates; and (2) Plaintiff was written up for (a) neglecting her job duties or responsibilities, (b) failing to follow a direct order to direct Campbell to remove unauthorized ornaments (beads) from her hair because she was in violation of DOC's "Employee Appearance and Dress" directive, and (c) using "[a]busive, profane or threatening language" in communicating with  Lieutenant McGinn.  (Dkt. No. 40, Part 37, at 2.)  Specifically, the reprimand states that Plaintiff called her Lieutenant McGinn a "racist," and did so in a manner

---

public interest concern."  *Id*. (citation omitted).  "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally."  *Id*. (citation omitted).

[22]      "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 [2d. Cir. 2001]).

that was loud enough for his nearby subordinate staff to hear.  (Dkt. No. 40, Part 37, at 2-3.)  In addition, Defendants have provided a copy of the investigatory material giving rise to the reprimand, which indicates that (1) Lieutenant McGinn had reasonable grounds to believe that Plaintiff had failed to follow the order in question, and (2) Plaintiff had repeatedly called Lieutenant McGinn a "racist," the second time actually "scream[ing]" the word after he had directed her to "watch what she was saying."  (Dkt. No. 40, Part 38.)[23]  Finally, Defendants have adduced deposition testimony that corroborates the foregoing evidence.  (Dkt. No. 51 at 11-27, 31, 33, 38-40, 55-60, 63-66 [McGinn Dep. Tr.]; Dkt. No. 49 at 6-15 [Blume Dep. Tr.]; Dkt. No. 45 at 149-53 [Washington Dep. Tr.].)[24]

As a result, the Court finds that Defendants effectively rebutted the presumption of discrimination raised by Plaintiff's setting out of a prima facie case.  In addition, the Court finds that Plaintiff has not offered any admissible record evidence that Defendants' proffered, non-discriminatory rationale for issuing the written reprimand is merely a pretext for retaliation.  Significantly, Plaintiff does not deny loudly calling Lieutenant McGinn a "racist," but instead attempts to downplay the incident by asserting that her comments were improperly "perceived."  (Plf.'s Rule 7.1 Response at ¶ 102.)  In addition, Plaintiff does not adduce admissible record evidence establishing that she received the written reprimand because of her race.

---

[23]    The Court does not deny the possibility that Plaintiff was asked to speak with Officer Campbell because of her race.  However, the material issue presented by Defendants' motion is whether the adverse action against Plaintiff–i.e., the issuance of the written reprimand–was taken to prevent Plaintiff from discussing her concerns about the racial motivations behind the order.

[24]    The Court notes that Plaintiff's own deposition testimony indicates her resistance to relaying the directive to Officer Campbell, and the passive-aggressive and equivocal way Plaintiff attempted to follow the Watch Commander's order.  (Dkt. No. 45 at 135-44, 149-53 [Washington Dep. Tr.].)

To the contrary, the record rather clearly establishes that the reprimand would have been issued regardless of Plaintiff's complaint that she was given an order because of her race.  This is because she had committed two punishable offenses: (1) she had disobeyed a direct order; and (2) she had repeatedly and loudly called Lieutenant McGinn a "racist" in front of subordinate staff.[25]  With regard to this second offense, the Court notes that, in addressing an analogous set of facts, the Seventh Circuit has explained:

> [The statement] 'Felton is a racist' is defamatory, and a person who makes an unsupported defamatory statement may be penalized without offending the [F]irst [A]mendment.  Whether that penalty is delivered in a slander action, in a perjury prosecution, in an award of attorneys' fees for making unsubstantiated allegations, or in the workplace by a suspension, is immaterial to the Constitution. What matters is that defamation of a co-worker may be punished, and . . . whether a particular defamatory statement is true or false is not a question of constitutional moment, unless the target is a 'public figure,' which Felton wasn't. . . .   The [Supreme] Court held in *Waters* [*v. Churchill*, 511 U.S. 661 (1994)] that so long as the employer honestly and reasonably believes that workplace speech is inappropriate or disruptive, then the Constitution permits a response whether the speech in question was true or false, disruptive or not.

*Taylor v. Carmouche*, 214 F.3d 788, 793-94 (7th Cir. 2000) [citations omitted].

As a result, Plaintiff's claim that she was retaliated against for complaining about the racial motivations of Lieutenant McGinn's order is dismissed.

---

[25]    With regard to the causation element, a plaintiff alleging a violation of Section 1981 "must prove 'but for' instead of 'motivating factor' causation in her prima facie case." *McCauley v. Greensboro City Bd. of Educ.*, 714 F. Supp. 146, 151 (M.D. N.C. 1987) (citing *Irby v. Sullivan*, 737 F.2d 1418, 1430 [5th Cir. 1984]); *see also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985); *Fahie v. New York City Dept. of Correction*, 737 F. Supp. 15, 17 (S.D.N.Y. 1990) (noting that Plaintiff was unable to "establish the requisite 'but for' causation," in her Title VII case, but that, "[e]ven assuming that such a 'causal link' ha[d] been shown and a prima facie case established, the Department . . . articulated legitimate nondiscriminatory reasons for not appointing Fahie.").  Here, because of Plaintiff's derogatory comments, it cannot be said that, but for her race, she would not have been reprimanded.

28

### 2.    First Suspension

Construed with the utmost of special leniency, Plaintiff's Complaint alleges that, after

complaining about an incident of racial discrimination against her in December of 2001, she was

punished for violating the DOC's socialization policy.  (Dkt. No. 1, ¶¶ 10-11, 52-54, 60-67, 88.)

Based on these factual allegations, Plaintiff has–again, barely–alleged facts plausibly suggesting

that she experienced adverse action because she engaged in protected activity.

In her response papers, Plaintiff has presented factual assertions that flesh out this claim.

(Plf.'s Rule 7.1 Response at ¶¶ 119-27, 223-31; Dkt. No. 56, at 29-30.)  Specifically, Plaintiff

asserts that the suspension she received in March of 2002 for violating the DOC's socialization

policy in September of 2001 was actually issued in retaliation for her complaint to

Commissioner Cowin in January of 2002 about racial discrimination that occurred in December

of 2001.

Under the circumstances, the Court has trouble finding that Plaintiff has set out a prima

facie case of retaliation.  Granted, Plaintiff has met her initial burden with regard to the first

three elements of a retaliation claim.  *See*, *supra*, Part IV.A. of this Decision and Order.

However, the Court is not convinced that Plaintiff has met her initial burden with regard to the

fourth element of a retaliation claim, which requires Plaintiff to establish a causal connection

between her protected speech (i.e., her complaint) and the adverse action she experienced (i.e.,

her suspension).

This is because Plaintiff's sole evidence of such a causal connection consists of the

temporal proximity between her complaint in January of 2002 and the issuance of her suspension

in March of 2002.  The Court acknowledges that"[t]he causal connection needed for a prima

facie case can also be 'established indirectly by showing that the protected activity was closely

followed in time by the adverse action.'" *Chamberlin v. Principi*, 247 F. App'x. 251, 254 (2d

Cir. Sept. 12, 2007) (citing *Lovejoy-Wilson v. NOCO Motor Fuel Inc.*, 263 F.3d 208, 224 [2d

Cir. 2001]) (internal quotation marks and citation omitted).  However, where "timing is the only

basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff

had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v.

Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  Here, according to Plaintiff's own

factual assertions, the DOC was aware of her violation of the socialization policy in September

of 2001.  Simply stated, if Plaintiff's complaint in January of 2002 were the cause of her being

punished for violating the policy, then one might reasonably expect her to have received that

punishment in January or February of 2002, and not in March of 2002.

In any event, even if the Court were to find that Plaintiff has set out a prima facie case of

retaliation, the Court would find that Defendants have effectively rebutted the resulting

presumption of discrimination.  This is because, as explained above in Part II.C.2. of this

Decision and Order, Defendants have adduced undisputed record evidence that the DOC became

aware of Plaintiff's relationship with a former inmate in September of 2001, after being notified

of that relationship by the SPD, which had learned about the relationship during an investigation

of a hit-and-run accident involving Plaintiff's vehicle.  Defendants have also adduced undisputed

record evidence that the DOC did not take disciplinary action against Plaintiff between

September of 2001 and March of 2002, because during that time period, rather than conduct its

own investigation of the socialization offense, the DOC was relying on information generated

during a criminal investigation of a related matter, conducted by the SPD and the Onondaga

County District Attorney's Office.  Finally, Defendants have adduced undisputed record

evidence that, while the DOC was interviewing Plaintiff regarding the socialization issue on or

just days before March 12, 2002, she admitted to having a relationship with a former inmate.

Having articulated–and established–a legitimate, non-retaliatory reason for suspending

Plaintiff, the burden of production shifts back to Plaintiff to introduce admissible record

evidence that Defendants' reason was a pretext for her suspension.  However, Plaintiff has

offered no admissible record evidence that the suspension was actually a pretext for retaliation.[26]

As a result, Plaintiff's claim that she was retaliated against for complaining about

discrimination in January of 2002 is dismissed.[27]

### B.      Hostile Work Environment

Construed with the utmost of special leniency, Plaintiff's Complaint alleges that she was

subjected to a racially and sexually hostile work environment, in violation of §§ 1981 and 1983

of Title VII, 42 U.S.C. § 2000e-5, and § 296 of the New York Executive Law.  (Dkt. No. 1, ¶¶ 2,

6-8, 11, 28-98.)  Defendants argue that Plaintiff is unable to establish a hostile work environment

claim.

"To establish a claim of hostile work environment, a plaintiff must show that: (1) he or

---

[26]      The Court notes that, as explained above in Part II.C.2. of this Decision and
Order, there is significant record evidence establishing that other officers who have violated the
socialization policy have received similar (or more extreme) punishments.

[27]      The Court notes that Plaintiff's retaliation claims are dismissed for the alterative
reason that Plaintiff failed to assert these claims in her New York Division of Human Rights
Complaint, and therefore Plaintiff did not properly exhaust her available administrative remedies
before filing this claim in this Court.  (Dkt. No. 41, Part 51, at 1-4 [Ex. YYYY to Defs.' Rule 7.1
Stmt.].)

she was subjected to harassment because of his or her membership in a protected class that was

so severe or pervasive as to alter the conditions of his or her employment; and (2) there is a

specific basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.*, 210

F. Supp.2d 330, 388 (S.D.N.Y. 2002) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.

1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 (1998),

and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998) [other citation omitted]).

"The test for the first prong is whether the employment environment was 'objectively

hostile'–that is, whether the environment was permeated with discriminatory intimidation,

ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Little*, 210 F. Supp.2d at 388

[citations and internal quotations omitted].  "The Supreme Court has emphasized that the

standard for judging whether a work environment is objectively hostile must be sufficiently

demanding so as to prevent Title VII from becoming a general civility code." *Little*, 210 F.

Supp.2d at 388 [internal quotation marks and citations omitted].  "Courts must distinguish

between merely offensive and boorish conduct and conduct that is sufficiently severe or

pervasive as to alter the conditions of employment." *Id.* [internal quotation marks and citations

omitted].

"In determining whether a workplace is objectively hostile, a court should look at the

totality of the circumstances." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 [1993]).

Factors that courts should examine include "the frequency of the discriminatory conduct, its

severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and

whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.*,

32

510 U.S. at 23.  "When evaluating the 'quantity, frequency, and severity' of the incidents, the

court must look at the incidents 'cumulatively in order to obtain a realistic view of the work

environment.'"  *Little*, 210 F. Supp.2d at 389 (citing *Schwapp v. Town of Avon*, 118 F.3d 106,

111 [2d Cir. 1997]).  "For acts of racial discrimination such as racist comments, slurs and jokes

to be actionable, there must be more than a few isolated incidents of racial enmity, meaning that

instead of sporadic racial slurs there must be a steady barrage of opprobrious racial comments."

*McCoy v. City of New York*, 131 F. Supp.2d 363, 372 (E.D.N.Y. 2001) (citing *Schwapp*, 118

F.3d at 110-11 [internal quotations and other citations omitted]).  "Isolated remarks or occasional

episodes of harassment will not merit relief under Title VII; in order to be actionable, the

incidents of harassment must occur in concert or with a regularity that can reasonably be termed

pervasive."  *Little*, 210 F. Supp.2d at 389 (citing *Quinn*, 159 F.3d at 768).

"Various types of acts, depending on their severity or pervasiveness, can create a hostile

work environment."  *Id*.  "Courts have found that a series of racist comments directed at an

employee can create a hostile work environment."  *Id*. (citing *Schwapp*, 118 F.3d at 112).

"Similarly, vulgar comments and gestures directed at employees can be sufficiently offensive,

pervasive and continuous to constitute a sexually hostile work environment.  *Id*. (citing *Kotcher*

*v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 61, 63 [2d Cir. 1992]).  "Offensive

displays can also create a hostile work environment."  *Id*.  "For example, courts have found

sexual harassment based on a hostile work environment where employees were subjected to 'the

display of obscene visual representations or the communication of sexually offensive remarks.'"

*Id*. (quoting *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 [S.D.N.Y. 1996]).

"Similarly, the . . . use of racial epithets, without more, may create a hostile work environment if

sufficiently continuous and pervasive."  *Id.* (citing *Snell*, 782 F.2d at 1103).

Racial or sexual epithets need not be directed at an employee to contribute to a hostile work environment, because "evidence of harassment of other members of the protected group, if part of a pervasive or continuing pattern of conduct, is surely relevant to show the existence of a hostile work environment."  *Id.* (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 [2d Cir. 1997]).  Moreover, racially offensive comments or incidents of racial harassment, though different in kind and occurring in different locations, may create a racially hostile work environment in violation of Title VII.  *Id.* at 391.

"Even if a work environment is found to be abusive, however, a plaintiff must establish that the conduct which created the hostile environment should be imputed to the employer."  *Tomka*, 66 F.3d at 1305 (citing *Kotcher*, 957 F.2d at 63 [other citation omitted]).  "[T]he Supreme Court [has] declined to announce a definitive rule on employer liability, holding instead that federal courts should be guided by common law principles of agency."  *Tomka*, 66 F.3d at 1305 (citing *Meritor Savings Bank v. Vinson*, 106 S. Ct. 2399, 2408 [1986]).  In light of this holding, the Second Circuit has derived certain rules to find an employer liable for permitting the existence of a hostile work environment.  *Id.*

Pursuant to the Second Circuit's rules, "if a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses his actual or apparent authority to further the harassment, or if the supervisor was otherwise aided in accomplishing the harassment by the existence of the agency relationship."  *Id.* (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 114 S. Ct. 2693 [1994]).  "By contrast, where a low-level supervisor does

34

not rely on his supervisory authority to carry out the harassment, or a co-employee of the

plaintiff is the alleged harasser, an employer will generally not be liable unless the employer

either [1] provided no reasonable avenue of complaint or [2] knew of the harassment but did

nothing about it."  *Id.* (citing *Karibian*, 14 F.3d at 780 and *Kotcher*, 957 F.2d at 63).

With regard to the requirement that the employer provide a reasonable avenue of

complaint, an employer who does not have a sexual harassment policy does not provide a

reasonable avenue for complaint.  *Brabson v. The Friendship House of W. New York*, 46 F.

App'x 14, 17-18 (2d Cir. 2002).  "However, there is no basis for a per se rule that the absence of

a written . . . policy, standing alone, permits a finding that the employer has failed to provide a

reasonable avenue for complaint . . . ."  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1180

(2d Cir. 1996) [citation and internal quotations omitted; emphasis added].

With regard to the requirement that the employer do something about harassment of

which it has knowledge, the essence of this requirement is the reasonableness of the employer's

response to the plaintiff's complaints.  *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.

1986) ("[W]e hold today that once an employer has knowledge of a racially combative

atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it.").

Furthermore, as the Second Circuit has explained,

> Whether the company's response was reasonable has to be assessed
> from the totality of circumstances.  Factors to be considered in this
> analysis are the gravity of the harm being inflicted upon the plaintiff,
> the nature of the employer's response in light of the employer's
> resources, and the nature of the work environment.

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) (citations omitted).  Other factors

may include (1) the amount of time that elapsed between the notice and remedial action, (2)

35

whether the response taken comported with the employer's policies, (3) whether the co-employees complained of were confronted and reprimanded, and (4) whether the response ended the harassment. *See Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162 (2d Cir. 2006); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 154 (2d Cir. 1997).

Of course, when there is a genuine issue of material fact as to whether or not the employer reasonably responded to the plaintiff's complaints, summary judgment is not appropriate. However, when there is no genuine issue of material fact as to whether or not the employer reasonably responded to the plaintiff's complaints, summary judgment is appropriate. *See, e.g., Finnerty*, 176 F. App'x at 162 (affirming district court's grant of summary judgment to employer because of reasonableness of its response to the plaintiff's complaints), *accord*, *McNally v. Posterloid Corp.*, 148 F. App'x 23, 25 (2d Cir. 2005); *Faulkner v. Niagara Mohawk Power Corp.*, 05-CV-0974, 2006 WL 3207815, at *7 (N.D.N.Y. Nov. 03, 2006) (McAvoy, J.) (granting summary judgment to employer because of reasonableness of its response to the plaintiff's complaints).

After carefully reviewing the record, the Court concludes as follows: (1) Plaintiff has not adduced admissible record evidence from which a rational fact-finder could conclude that she was subjected to an abusive work environment; and (2) even if Plaintiff had adduced sufficient admissible record evidence from which a rational fact-finder could conclude that she was subjected to an abusive work environment, she has not adduced admissible record evidence from which a rational fact-finder could conclude that the conduct which created the environment should be imputed to the DOC.

       **1.**      **Abusive Work Environment**

Plaintiff's Complaint appears devoid of factual allegations plausibly suggesting which of the incidents described in the Complaint, if any, give rise to her claims that she was subjected to a racially and sexually hostile work environment.  (*See* Dkt. No. 1, ¶¶ 2, 6-8, 11, 28-98.)  For the sake of brevity, the Court will set aside the issue of whether the factual allegations of Plaintiff's Complaint have given Defendants "fair notice" of her hostile-work-environment claims under Fed. R. Civ. P. 8.  Instead, the Court will look to Plaintiff's papers in opposition to Defendants' motion for a descriptions of the incidents giving rise to her hostile-work-environment claims.

In her opposition memorandum of law, Plaintiff identifies what are essentially nine separate incidents giving rise to her hostile work environment claims.  (Dkt. No. 56, at 8-16.)

First, Plaintiff argues, at some point in the "early 1980s" (presumably after May of 1982, when she was hired), an asterisk was placed next to the names of female employees (including Plaintiff) on DOC records.  (Dkt. No. 56, at 8.)  In support of this argument, Plaintiff cites her own affidavit, which provides no more detail regarding the practice.  (Dkt. No. 54, ¶ 28.)  Plaintiff also cites an "Exhibit GG."  (*Id*.)  The only Exhibit GG that the Court can find on the docket is Exhibit GG to Defendants' Rule 7.1 Statement.  (Dkt. No. 40, Part 38.)  The only part of that docket entry that could conceivably pertain to Plaintiff's factual assertion are the last three pages of that sixteen-page exhibit.  (*Id*. at 14-16.)  Those three pages consist of DOC Watch Logs from August 19-21, *2001*.  (*Id*. [emphasis added].)  While two of those three pages contain asterisks besides various correction officers' names, the asterisks denote the fact that those officers are "Weapons Qualified," according to the Logs.  (*Id*.)  In none of the lists is there an asterisk by either the names of Plaintiff or C.O. Washington, both of whom are females.  (*Id*.)

Second, Plaintiff argues, at some point in the "mid 1980s," Plaintiff asked to be

37

transferred to the maintenance department, but was told that "these jobs are not for women."

(Dkt. No. 56, at 8.)  In support of this argument, Plaintiff cites her own affidavit, which does not

describe (1) in what month or even year this statement was made, (2) who made this statement to

her, (3) in what capacity the speaker or writer made this statement to her, (4) how this statement

was made to her, and (5) where the statement was made to her.  (Dkt. No. 54, ¶ 27.)

Third, Plaintiff argues, on or about January 21, 1993, one or more unidentified white

correction officers (1) defaced posters advertising Black History Month, by striking out the word

"black" and replacing it with the word "white," and (2) removed inmate sign-up sheets for Black

History Month events.  (Dkt. No. 56, at 8.)  Upon learning of these actions, Plaintiff contacted

the DOC Commissioner (Pat Tappan), voiced her concerns, and asked that appropriate

professional action be taken.  (*Id*. at 8-9.)  In response, Commissioner Tappan required that DOC

employees  receive cultural diversity training.  (*Id*. at 9.)  All DOC supervisors subsequently

received the training.  (*Id*.)  While Plaintiff testified in her deposition that, at some point in time,

she heard some unidentified correction officers say they had not (yet) received the training,

record evidence exists indicating that, ultimately, *all* correction officers did in fact receive the

training.  (*Compare* Dkt. No. 46 at 214-15 [Washington Dep. Tr.] *with* Dkt. No. 40, Part 13 [Ex.

H to Defs.' Rule 7.1 Stmt.].)

Fourth, Plaintiff argues, between approximately April 5, 1999, and April 9, 1999, a racial

joke was told in the staff dining room involving acronym "N.E.O.N.."  (Dkt. No. 56, at 9.)  After

Senior Correction Officer Adams complained about the incident, the DOC undertook an

investigation.  (*Id*.)  During the investigation, a number of staff members came forward to report

that they heard that the "joke" had been told by Senior Correction Officer Dwight Benjamin.

(*Id*.)  However, DOC Assistant Commissioner Thomas Sheedy did not take formal action for the stated reason that his investigation had not yielded first-hand information identifying the officer who told the "joke," only hearsay.  (*Compare* Defs.' Rule 7.1 Stmt. at ¶¶ 90-91 *with* Plf.'s Rule 7.1 Response at ¶¶ 218-19.)  This stated reason is consistent with the written communications generated during the investigation.  (Dkt. No. 41, Parts 37-39 [Exs. KKKK, LLLL, and MMMM to Defs.' Rule 7.1 Stmt.].)

Fifth, Plaintiff argues, at some point in late 2000, she confronted Senior Correction Officer Brush, who had circulated a derogatory flyer depicting what Plaintiff described as "two black figures playing basketball."  (Dkt. No. 56, at 12; Defs.' Rule 7.1 Stmt. at ¶¶ 93-97; Plf.'s Rule 7.1 Response at ¶ 232; Dkt. No. 41, Part 40 [Ex. NNNN to Defs.' Rule 7.1 Stmt., attaching flyer].)  Senior Correction Officer Brush had generated and circulated the flyer for the purpose of exchanging a basketball for some other supplies.  (Dkt. No. 56, at 12; Defs.' Rule 7.1 Stmt. at ¶ 94; Plf.'s Rule 7.1 Response at ¶ 232; Dkt. No. 41, Part 40 [Ex. NNNN to Defs.' Rule 7.1 Stmt., attaching flyer].)  After Senior Correction Officer Brush told Plaintiff she did not see anything wrong with the flyer, Plaintiff showed the flyer to her Watch Commander, Lieutenant Kevin McGinn, complaining that it was racially offensive.  (Dkt. No. 56, at 12; Defs.' Rule 7.1 Stmt. at ¶¶ 97-98; Plf.'s Rule 7.1 Response at ¶ 233.)  Lieutenant McGinn replied that he did not feel that it was Senior Correction Officer Brush's intent to circulate something racial, and that perhaps Plaintiff was reading more into the illustration on the flyer than was actually there.  (Dkt. No. 56, at 12; Defs.' Rule 7.1 Stmt. at ¶¶ 98-99; Plf.'s Rule 7.1 Response at ¶ 234.)  Plaintiff did not pursue the matter any further up the chain of command.  (Defs.' Rule 7.1 Stmt. at ¶ 100; Plf.'s Rule 7.1 Response at ¶¶ 234-35.)

Sixth, Plaintiff argues, on or about August 21, 2001, she was ordered to discipline a fellow African-American correction officer, Angela Campbell, for Ms. Campbell's alleged violation of Defendants' policy regarding improper hair styling, and that, when she complained about the racial motivation behind this order, she received a written reprimand. (Dkt. No. 1, ¶¶ 10-11, 80-88.) As discussed above in Part IV.A.1 of this Decision and Order, Plaintiff was disciplined after her complaint to Lieutenant McGinn that she believed his decision to make her, instead of Campbell's supervisor, address Campbell was based on race. More specifically, Plaintiff was disciplined because she called Lieutenant McGinn a racist.

Seventh, Plaintiff argues, on or about December 13, 2001, Sergeant Benjamin told her to "kiss my ass." (Dkt. No. 56, at 10.) In response, Plaintiff filed a formal complaint of racial and sexual harassment. (*Id*. at 10-11.) After investigating the matter, the DOC learned that there were no other witnesses to the incident, and that Benjamin claimed that Plaintiff had insulted him first, he intended the remark as a joke, and he had already subsequently apologized to her. (*Id*. at 11; *see also* Dkt. No. 41, Part 44 [Ex. RRRR to Defs.' Rule 7.1 Stmt.].) As a result, the DOC decided to handle the matter informally. (Dkt. No. 56, at 11.) During the mediation that ensued, Benjamin personally apologized to Plaintiff a second time and stated it would never happen again. (*Id*. at 11-12; *see also* Dkt. No. 41, Part 43-44 [Exs. QQQQ, RRRR, and SSSS to Defs.' Rule 7.1 Stmt.]; Dkt. No. 44 at 71-74 [Cowin Dep. Tr.].) The record reflects no subsequent problems between Benjamin and Plaintiff.

Eighth, Plaintiff argues, in September 2002, she suffered a serious injury to her back at work after she was forced to conduct inmate dinner by herself without proper coverage and backup and a fight broke out between two inmates in the "mess hall." (Dkt. No. 56, at 13-14.)

According to Plaintiff, dinner is usually handled by at least two officers and when there is not adequate staff coverage, inmate dinner is delayed until proper coverage can be arranged.  (*Id*. at 14; Dkt. No. 54 at ¶ 87 ["Washington Aff."].)  However, on this particular occasion, Plaintiff argues that she was ordered by Lieutenant Patrick Conboy, a white male, to immediately start dinner.  (Dkt. No. 56, at 14; Washington Aff. at ¶¶ 88-89.)  According to Plaintiff, she was injured when she tried to break up the fight that broke out between the two inmates.  (Dkt. No. 56, at 14; Washington Aff. at ¶¶ 88-93.)  Plaintiff states that white officers are not made to cover inmate dinner without proper coverage.  (Dkt. No. 56, at 14; Washington Aff. at ¶¶ 88-93.)

Finally, Plaintiff argues, in February 2002, she and her fellow African American Officers established the Black Correction Officers Association, and in March 2002, enlisted the help of Onondaga County Legislators Lovie, Winslow, and Althea Chapman (hereinafter "Legislators") to discuss with Commissioner Cowin their concerns and complaints about discrimination.  (Dkt. No. 56, at 14; Washington Aff. at ¶¶ 97-98.)  The Legislators set up a meeting with Commissioner Cowin and confirmed the matters to be discussed in the meeting by letter to Cowin dated April 3, 2002.  (Dkt. No. 56, at 14; *see also* Dkt. No. 41, Part 49 [Ex. WWWW to Defs.' Rule 7.1 Stmt.]; Washington Aff. at ¶ 99.)  In particular, the letter indicated that Plaintiff and her coworkers' had the following concerns: (1) limited promotional opportunities for minorities; (2) low minority retention; (3) inequitable disciplinary handling when dealing with minorities; (4) retaliation for speaking out and/or filing a complaint; (5) limited training opportunities for minorities; (6) inequitable enforcement of the Departments Socialization Directive; (7) minority access to "Special Assignments," and/or "In House Promotions;" (8) minority involvement in the "Honor Guard;" (9) minority officers participation in the "Black

History Month Program" as in prior years; and (10) inequitable shift assignments.  (Dkt. No. 56, at 14; *see also* Dkt. No. 41, Part 49 [Ex. WWWW to Defs.' Rule 7.1 Stmt.].)

On April 4, 2002, Commissioner Cowin met with Legislators Winslow and Chaplin, and three (3) African American Correction officers to discuss concerns outlined in the letter.  (Dkt. No. 56, at 15; Dkt. No. 47, at 77-85 [Cowin Dep. Tr.].)  After the meeting, Officer Maxine Adams, on behalf of the Black Correction Officer Association, sent Cowin a letter dated May 8, 2002, memorializing all of the issues discussed in the April 4, 2002 meeting.  (Dkt. No. 56, at 15;  *see also* Dkt. No. 41, Part 50 [Ex. XXXX to Defs.' Rule 7.1 Stmt.].)  Despite sending these two letters, Commissioner Cowin did nothing to investigate the expressed concerns.  (Dkt. No. 56, at 15; Dkt. No. 47, at 79, 82-83, 92-93 [Cowin Dep. Tr.].)[28]

After carefully considering this record evidence, the Court finds that, at most, Plaintiff has established an environment involving random episodes of discrimination.  However, these random episodes do not rise to the continuous, concerted pattern necessary to support a hostile work environment claim.  *Alfano* 294 F.3d at 374.  The Court reaches this conclusion for two reasons: (1) the Court finds that the first, second, fifth, and ninth incidents identified above do not constitute harassment, based on the evidence presented, even when viewed in the light most

---

[28]        Plaintiff cites to Cowin's deposition testimony, in which he states, "[i]nvestigated, no.  I looked it all up and explained what the issue was and how they worked, there wasn't any need."  Dkt. No. 47, at 83.  However, this statement is somewhat out of context, because Cowin also stated, with regard to the meeting, "[i]t really wasn't an investigation. Basically it was an informational meeting to what happens and how it works.  They had no idea how civil service works."  (Dkt. No. 47, at 79-80.)  Moreover, there is no admissible record evidence that would suggest that Plaintiff, or any of the other black officers involved in the Black Correction Officers Association, asked Cowin to perform an investigation of the concerns identified in their April 3, 2002 letter, and in fact, the May 8, 2002 letter, which thanks Commissioner Cowin for the April 4, 2002 meeting, indicates that all of the issues that black officers were concerned with were discussed at the meeting.  (Dkt. No. 41, Part 50 [Ex. XXXX to Defs.' Rule 7.1 Stmt.].)

favorable to Plaintiff; and (2) the Court finds that five other instances of harassment over a period of more than a decade do not amount to a *per se* hostile work environment. *See Stembridge v. City of New York*, 88 F.2d 276, 286 (S.D.N.Y. 2000) (random racial and/or sexual incidents over a course of years are not *per se* indicative of a hostile environment). This is especially true in light of the fact that the response that the employer took ended the harassment with regard to the third, fourth and seventh incidents identified above, and the remaining two other incidents (the sixth and eighth incidents identified above) were single, isolated incidents.

In addition to the infrequency of the alleged harassment, the Court notes that Plaintiff has not adduced admissible record evidence establishing that any of the incidents unreasonably interfered with her ability to work, or even caused her psychological harm. Moreover, the Court notes that none of the alleged incidents of harassment were physically threatening. Simply stated, the Court finds that no rational fact-finder could conclude, from the current record, that Plaintiff was subjected to conduct that was so severe or pervasive as to alter the conditions of her employment.

## 2.      Imputing the Conduct to the Employer

Even if the Court were to find that the above-mentioned incidents amount to a hostile work environment, the Court finds that no rationale fact finder could conclude that the conduct should be imputed to Defendants. This is because, in order to hold Defendants liable for the actions of the employees of the DOC, Plaintiff would have to show that Defendants "either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998). Plaintiff is unable to make this showing because, in three of the incidents described above, Defendants underwent

some sort of investigation, which resulted in (1) the implementation of diversity training, and (2) an apology from Officer Benjamin.  Moreover, the record reflects that two of the incidents raised by Plaintiff involved Officer Benjamin, and that Plaintiff has had no further issues with Officer Benjamin since he was ordered to apologize to Plaintiff.  In addition, the record reflects that Defendants have a policy against harassment and discrimination, as well as a discrimination Grievance Procedure in place whereby aggrieved employees may file complaints.  In sum, even assuming that the incidents that Plaintiff raises collectively amount to a hostile work environment, she has failed to show that Defendants "either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it."

As a result, Plaintiff's hostile work environment claim is dismissed.

### C.    Discrimination

Plaintiff alleges that Defendants discriminated against her on the basis of her sex and gender, in violation of §§ 1981 and 1983 of Title VII, 42 U.S.C. § 2000e-5, and § 296(1)(a) of the New York Executive Law, by denying her a promotion to lieutenant on six separate occasions.  (Dkt. No. 1.)  Defendants argue that Plaintiff is unable to establish a cause of action for discrimination.  For the reasons set forth below, Plaintiff's discrimination claim is dismissed.

Employment discrimination claims are analyzed under the same burden-shifting framework of *McDonnell Douglas*.[29]  "Under the *McDonnell Douglas* burden-shifting framework . . ., a plaintiff who claims to have been subjected to race discrimination in violation of Title VII must first make a prima facie showing of racial discrimination."  *Aspilaire*, 2009 WL 988648, at *9 (citing *McDonnell Douglas Corp*., 411 U.S. at 802).  "A plaintiff sets forth a prima

---

[29]    *See, e.g., Hurd v. New York City Health & Hospitals Corp*., 07-CV-1250, 2008 WL 5120624, at *1 (2d Cir. Dec. 8, 2008).

facie case by establishing that: (1) she is a member of a protected class; (2) she is qualified for the position that she held or sought; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination." *Id.* (citation omitted).

"If a plaintiff sets forth a prima facie case of discrimination, then a presumption of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its actions." *Id.* (citations omitted). "Defendant meets this burden by introducing admissible evidence establishing a non-discriminatory rationale which, if believed by the trier of fact, would support the finding that race discrimination did not underlie the adverse employment act." *Id.* (citation omitted). "[I]f the defendant carries its burden of production, then the presumption of discrimination raised by the plaintiff's prima facie case is rebutted and the plaintiff must establish, by a preponderance of the evidence, that the defendant's proffered, non-discriminatory rationale is merely a pretext for discrimination." *Id.* (citation omitted).

As previously noted, in deciding who to promote, the Commissioner must select from one of the top three highest scoring candidates on the Civil Service Examination who is interested in the position. (Cowin Aff. at ¶ 36.) In deciding among the three candidates, the Commissioner considers a number of factors, including previous training, experience, and overall employment history, which encompasses attendance, performance evaluations, achievements, disciplines and seniority. (*Id.* at ¶ 37.)

The first time that Plaintiff was denied the promotion, the person promoted was the top-scorer on the exam, and also had the necessary experience. The second time that Plaintiff was denied the promotion, the DOC promoted Sergeant Robert Burnett, who ranked ahead of

Plaintiff on the list, and who had previously held the title of lieutenant, but due to a county

work-force reduction had been demoted to sergeant.  The third time that Plaintiff was denied the

promotion, Sergeant McGinn was promoted.  In addition to being ranked ahead of Plaintiff on

the list, according to Defendants, McGinn was more qualified for the position than Plaintiff.  The

remainder of the times that Plaintiff was denied the promotion was because of prior suspensions

that she received.[30]

The Court finds that Plaintiff is able to make out a prima facie case of discrimination

with regard to being denied promotions.  Plaintiff is a member of a protected class.  Moreover,

by being ranked in the top-three on the Certified Examination List, and working for Defendant

for a number of years, Plaintiff has demonstrated that she is qualified for the position of

lieutenant.  In addition, the denial of a promotion is certainly adverse employment action, and

Plaintiff has alleged facts plausibly suggesting that the denial was because of her race.

However, the Court finds that Defendants have provided a non-discriminatory reason for

each of Plaintiff's denials.  Specifically, Defendants have indicated that, prior to Plaintiff's

suspension, those promoted instead of her scored higher than her on the exam, and were more

qualified for the demands of the particular lieutenant position.  Moreover, Defendants did not

promote Plaintiff after her suspension because disciplinary history is a factor that is considered,

as evidenced by the fact that she was not the only person denied a promotion because of a prior

suspension.

In addition, Plaintiff has failed to meet her burden of demonstrating that the denials were

a pretext for discrimination because she has offered no any evidence that her denials were a

---

[30]      Another individual, who scored higher on the exam than did Plaintiff, was also
denied the promotion because of prior suspensions.

pretext for discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000) ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the probative value of the proof that the employer's explanation is false.").  Instead, Plaintiff has only asserted, in conclusory fashion, that because Defendants failed to produce personnel files of the individuals who were promoted over her, it should be presumed that these individuals were not more qualified than her.  Such a conclusory assertion is not enough to withstand summary judgment.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *see also Goenaga v. March of Dimes Birth Found*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

As a result, Plaintiff's claim that she was denied a promotion to lieutenant because of her race is dismissed.

### D.    Disparate Treatment

Plaintiff alleges that Caucasian officers at the Onondaga County Correctional Facility are punished less severely than African American Officers, in violation of §§ 1981 and 1983 of Title VII, 42 U.S.C. § 2000e-5, and § 296(1)(a) of the New York Executive Law.  (Dkt. No. 1, at ¶ 48.)  In support of this claim, Plaintiff argues (1) that she was demoted for an alleged second violation of the socialization policy, although other white officers were not demoted for similar conduct, (2) that she was forced to address Officer Campbell's appearance, but other white supervising officers were not, and (3) that she was interrogated by supervisors about whether she

continued to be in violation of the socialization policy after she returned from her suspension. (Dkt. No. 56, at 27.)  Defendants argue that Plaintiff is unable to establish a cause of action for disparate treatment.  For the reasons set forth below, Plaintiff's disparate treatment claim is dismissed.

"A plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate, in applying the *McDonnell Douglas* test, that she was subject to an adverse employment action 'and that a similarly situated employee not in the relevant protected group received better treatment.'"  *Carter v. New Venture Gear, Inc.*, 310 F. App'x. 454 (2d Cir. Feb. 18, 2009) (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 [2d Cir. 2001]). "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself."  *Graham*, 230 F.3d at 39 (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 [2d Cir. 1997] (finding that the female plaintiff, who claimed she was forced to resign for violating an anti-fraternization policy, was not similarly situated to the male co-workers she claimed violated the same policy but who were not disciplined because these co-workers and plaintiff had different supervisors, and at least one male manager who reported to the same supervisor as plaintiff was interviewed and ultimately resigned for violation of the policy.).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted).

"What constitutes 'all material respects' . . . varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly

situated were subject to the same workplace standards and (2) whether the conduct for which the

employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 39 (citation

omitted).  "In other words, there should be an objectively identifiable basis for comparability."

*Id*. (internal quotation marks and citation omitted).  "Hence, the standard for comparing conduct

requires a reasonably close resemblance of the facts and circumstances of plaintiff's and

comparator's cases, rather than a showing that both cases are identical."  *Id*. (citation omitted).

"The determination that two acts are of comparable seriousness requires–in addition to an

examination of the acts–an examination of the context and surrounding circumstances in which

those acts are evaluated."  *Id*. (citation omitted).

### 1.       Demotion

After receiving her second suspension, Plaintiff was demoted two ranks.  An arbitrator

later overturned the disciplinary measures taken against Plaintiff.

The Court finds that Plaintiff is able to make out a prima facie case of discrimination

with regard to being demoted.  Plaintiff is a member of a protected class.  Moreover, having held

the position of sergeant for a number of years prior to her demotion, Plaintiff has demonstrated

that she was qualified for the position of sergeant.  In addition, a demotion is certainly adverse

employment action, and Plaintiff has alleged facts plausibly suggesting that she was demoted, in

part, because of her race.

However, the Court finds that similarly situated employees not in the relevant protected

group did not receive better treatment than Plaintiff.  More specifically, as Defendants point out,

between 1999 and 2004, six staff members were disciplined for violating the socialization

policy.  (Dkt. No. 40, Part 5, at 17.)  These individuals included four white males, one African-

American male, and Plaintiff.  (Dkt. No. 40, Part 5, at 17.)  With the exception of Plaintiff and

one Caucasian male, all received the harshest sanction in that they were terminated after having

been found in violation of the socialization policy.  (*Id.*)

Moreover, the one Caucasian male who was not terminated was a senior officer, whereas

Plaintiff was a sergeant.  Based on their difference in rank, the two individuals cannot be said to

be similarly situated in "all material respects."  In addition, Plaintiff has not offered any evidence

that would in any way suggest that the actions of Plaintiff and the other individual were of

comparable seriousness.  Therefore, it cannot be said that similarly situated employees not in the

relevant protected group received better treatment than Plaintiff.[31]

### 2.     Incident with Officer Campbell

As previously mentioned, Plaintiff received a written reprimand for failing to follow a

job instruction *and* for making a derogatory remark toward her Watch Commander.  Plaintiff

claims that other white officers were not told to speak with Officer Campbell about her hair, and

this fact alone constitutes disparate treatment.

To the extent that Plaintiff is asserting that the disparate treatment was the fact that she,

and not any of the white officers, was forced to speak with Officer Campbell, this claim fails

because (1) Plaintiff was Officer Campbell's supervisor,[32] and (2) more importantly, asking a

sergeant to do something that is within his or her job description–i.e., speaking with an inferior

---

[31]     Plaintiff also seeks to compare herself to Officer Benjamin, noting that he
received no punishment after telling her to "kiss his ass" but that she received punishment for
failing to carry out job instructions on different occasions.  The problem with this assertion is
that Plaintiff's actions are not comparable to Officer Benjamin's actions.  As a result, Plaintiff's
claim has no merit.

[32]     Although Plaintiff denies this, that denial is not supported by any admissible
record evidence.

officer about his or her conduct–does not constitute discipline.

Moreover, to the extent that Plaintiff is asserting that the disparate treatment was the fact that she was written up for failing to follow a job instruction, but no other officer was written up, this claim also fails for two reasons.  First, there is no evidence that any of the white officers received an order to speak with Officer Campbell, and therefore, there is no evidence that any of the white officers were similarly situated.  Second, and more importantly, at least part of the reason why Plaintiff was written up was because she called her Watch Commander a racist, and there is no evidence that any white officers made derogatory remarks toward the Watch Commander and avoided punishment.  Therefore, it cannot be said that similarly situated employees not part of Plaintiff's protected group received better treatment than Plaintiff.

### 3.    Interrogation of Plaintiff Regarding Socialization Policy

Plaintiff claims that, after she returned from work after her first suspension, she was interrogated about whether or not she was in compliance with the socialization policy.  As previously mentioned, there is only one other employee who was not terminated for violating the socialization policy.  Moreover, the facts of this employee's violation of the socialization policy are different than the facts surrounding Plaintiff's violation of the socialization policy.

In sum, Plaintiff has not alleged facts plausibly suggesting that her situation is comparable to the situation of any other employee, or that similarly situated employees who are not members of a protected class received better treatment than Plaintiff.

As a result, Plaintiff's disparate treatment claim is dismissed.


### E.    Plaintiffs State Law Claim for Intentional Infliction of Emotional Distress

Plaintiff claims that Defendants "intentionally, wantonly, willfully, maliciously, wrongfully and with . . . extreme and outrageous character . . . cause[d] the severe emotional distress suffered by Plaintiff, in violation of New York law."  (Dkt. No. 1, at 16.)  Liberally construed, the Court interprets this as a tort claim for intentional infliction of emotional distress ("IIED").  However, for the reasons that follow, this claim must be dismissed.

To prove IIED, Plaintiff must prove the following four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993). This conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and utterly intolerable in a civilized society."  *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983) (noting also that there must be a character of malice inherent in this strict standard of outrageous behavior. ); *see also Owen v. Leventritt*, 571 N.Y.S.2d 25, 25 (N.Y. App. Div., 1st Dept. 1991) (Recovery for IIED is available "only where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation.").

Plaintiff has not alleged facts plausibly suggesting that she was exposed to extreme and outrageous conduct.  Instead, Plaintiff has alleged, at most, that she was exposed to derogatory, racist remarks and activities, and such an allegation is not enough to make out an IIED claim. *See, e.g., Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 548 N.Y.S.2d 513, 514 (N.Y. App. Div., 2d Dept. 1989) (affirming dismissal of IIED claim where plaintiff alleged she was frequently the subject of derogatory, racist remarks).  Plaintiff has also not alleged facts plausibly suggesting

that she suffered severe mental pain or anguish, as opposed to disgust or frustration.  Finally,

Plaintiff has not alleged facts plausibly suggesting any conduct by a supervisor that caused her

severe emotional distress.

As a result, Plaintiff's IIED claim is dismissed.

**F.       Plaintiff's Section 1981 and 1983 Claims**

Plaintiff implicitly alleges in her Complaint that Defendants had a custom or policy that

led to the constitutional deprivations that she suffered.  Defendants argue that Plaintiff cannot

establish a cause of action under either 42 U.S.C. § 1981 or § 1983 because Plaintiff has not

alleged facts plausibly suggesting even an inference of a custom or policy that led to

constitutional deprivations.  For the reasons set forth below, Plaintiff's 42 U.S.C. §§ 1981 and

1983 claims are dismissed.

To establish claims under Sections 1981 and 1983 against a municipality, a plaintiff must

show that the actions conducted by a lower-echelon employee were performed pursuant to a

municipal policy or custom.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692-94 (1978).

Liability cannot be premised on a theory of respondeat superior.  *Monell*, 436 U.S. at 690-91.

The improper custom or policy may be established by showing that the municipality either (1)

failed to train its employees in a manner that reflected deliberate indifference to the

constitutional rights of at least some of its employees, or (2) had notice of but repeatedly failed

to make any meaningful investigation into employee charges.  *See Ricciuti v. New York City*

*Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

As an initial matter, because the Court has found that Plaintiff did not suffer any

constitutional deprivations as a result of Defendants' actions, this claim must be dismissed.

In the alternative, this claim must be dismissed because Plaintiff has not adduced any admissible record evidence supporting her claim that Defendants had a custom or policy of failing to train employees on discriminatory issues.  To the contrary, the record reflects that Defendants have, since the 1990s, (1) issued diversity and harassment materials to their employees, (2) held diversity training classes, and (3) conducted investigations when discriminatory concerns are raised by employees.  Plaintiff has also failed to demonstrate any evidence from which a rationale factfinder could conclude that Defendants were deliberately indifferent to employee charges.  As stated, Defendants almost always investigated Plaintiff's complaints, and took action as a result of their investigations.

As a result, Plaintiff's claim against Defendants for violation of Sections 1981 and 1983 is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED** in its entirety.

Dated: September 29, 2009
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge